# Exhibit C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| ADAM SHERMAN, individually and derivatively on behalf of COTTONWOOD VENDING LLC,<br><br>Plaintiff,<br><br>- against -<br><br>ANIELLO ZAMPELLA and COINDADO LLC,<br><br>Defendants,<br><br>and<br><br>COTTONWOOD VENDING LLC,<br><br>Nominal Party. | Index No.  655176/2021<br><br><br>**FIRST AMENDED COMPLAINT** |

AS AND FOR PLAINTIFF'S FIRST AMENDED COMPLAINT, in the above-captioned action, Plaintiff Adam Sherman ("Sherman"), individually and derivatively on behalf of Cottonwood Vending LLC, by and through Sherman's attorneys, alleges as follows:

**PRELIMINARY STATEMENT**

1. Sherman and defendant Zampella both own membership interests in nominal defendant Cottonwood Vending LLC ("Cottonwood")—a highly successful cryptocurrency business. Unfortunately, Zampella is not an honorable businessman and refuses to honor his contractual obligations and fiduciary duties. Specifically, Zampella refuses to acknowledge Sherman's 9.9% membership interest in Cottonwood and has orchestrated an illegal scheme to loot Cottonwood of its valuable proprietary software as well as a large portion of its profits.

{00432821.DOCX; 1}

2. By this action, Sherman seeks, amongst other things, to recover his share of the looted assets and profits, and obtain an order directing Zampella to purchase Sherman's 9.9% membership interest at fair value, or alternatively, dissolve Cottonwood and appoint a receiver.

## PARTIES

3. Sherman is an individual domiciled in New York and residing at 149 W. 24th Street, Apt. 4C, New York, NY 10011.

4. At all relevant times, Sherman has been, and continues to be, a member of Cottonwood.

5. At all relevant times, Sherman served as Chief Technical Officer ("CTO") and Chief Information Security Officer ("CISO") for Cottonwood.

6. After initiating this lawsuit, Zampella terminated Sherman's employment with Cottonwood.

7. Defendant Zampella is an individual domiciled in New York and residing at 8 Spruce Street, Apt. 69T, New York, NY 10038. Zampella is the sole member of defendant Coindado LLC ("Coindado").

8. Defendant Coindado (together with Zampella, "Defendants") is a Puerto Rico limited liability company with its corporate offices located at 151 Calle de San Francisco, Suite 200, PMB 5337, San Juan, PR 00901-1607. Coindado is 100% owned and controlled by Zampella.

9. Nominal party Cottonwood is a New York limited liability company with corporate offices located at 116 Nassau Street, Fifth Floor, New York, NY 10038.

10. At all relevant times, Zampella has been the managing member of Cottonwood and the majority/controlling member of Cottonwood.

11. It would be futile for Sherman to suggest that Zampella sue himself as the managing member and controlling member of Cottonwood. Therefore, demand is not necessary with regard to Sherman's derivative claims.

**FACTUAL ALLEGATIONS**

I. **ZAMPELLA ENLISTED SHERMAN TO HELP BUILD COTTONWOOD IN RETURN FOR A SALARY AND A MEMBERSHIP INTEREST IN THE COMPANY**

12. Sherman and Zampella have been acquaintances since at least 2013 and were engaged in a prior business venture together, ActionCrypto.

13. Sherman has over 15 years of experience developing financial technology ("fintech") software and algorithmic trading systems. He is fluent in Java, Python, R and C/C++. Sherman has also held Series 7 and Series 63 securities licenses.

14. In 2013, Sherman wrote the source code for ActionCrypto's primary product, a binary options trading system (i.e., a system that allows traders to make bets on Bitcoin). Zampella owned ActionCrypto, along with two other parties.

15. Cottonwood was founded by Zampella and incorporated on June 2, 2016. Cottonwood's primary business is operating Bitcoin kiosks/ATMs throughout the New York City area. It currently operates 100 Bitcoin kiosks/ATMs.

16. Upon founding Cottonwood, Zampella encountered many difficulties with the operations and business model. Zampella had previously worked with Sherman and soon realized that he needed Sherman's help to build Cottonwood into a successful business.

17. On November 19, 2017, Zampella hired Sherman as the CTO of Cottonwood.

18. At this time, Sherman and Zampella orally agreed that in return for his work as CTO of Cottonwood, Sherman would be paid an annual salary of $125,000. Because Sherman

3

would not agree to work for Cottonwood for an annual salary of $125,000, Zampella also granted Sherman a 9% membership interest in Cottonwood (the "MI") as of November 19, 2017.

19. Zampella confirmed the MI in writing in a Whatsapp conversation with Sherman on July 13, 2020, even appearing to say it was as high as 10%:

> 7/13/20, 12:24 PM - Adam: i own 10% of cottonwood, correct?
> 7/13/20, 12:25 PM - Adam: so what makes you think i'm interested in just 'cashing out' for a few hundred k
> 7/13/20, 12:25 PM - Aniello: because that's what you just said
> 7/13/20, 12:25 PM - Adam: this is true, correct?
> 7/13/20, 12:25 PM - Aniello: you seem to only ever want to discuss a quick cash out - and not the responsibilities that you promised and we never got
> 7/13/20, 12:26 PM - Adam: you're not answering my question
> 7/13/20, 12:26 PM - Aniello: you're not really answering mine either
> 7/13/20, 12:26 PM - Adam: it's a y/n
> 7/13/20, 12:26 PM - Adam: this.
> 7/13/20, 12:26 PM - Adam: is that true, or not?
> 7/13/20, 12:29 PM - Aniello: 10% of like nothing is still nothing ......[1]

20. Even if Zampella did not somehow grant Sherman a 9% MI in November 2017, Zampella most certainly granted Sherman a 9.9% MI when the BitLicense for Cottonwood vested, which it did on January 31, 2019. This is reflected in the below email from Zampella to Cottonwood's general counsel:

> "Lastly, and we still need to have Latham draw this up, but: pending the license being granted due to Adam coming on board & helping in other ways, he would receive 9.9% equity in Cottonwood to be vested at the time DFS gives the green light & approves us for a trip to the moon..."[2]

21. Then again, on July 20, 2018, Zampella stated that Sherman's MI in Cottonwood would be 9.9% upon the eventual issuance of the BitLicense. This was reflected in an email with Cottonwood's attorneys at Latham & Watkins LLP, where Zampella said the Cottonwood structure chart "doesn't reflect the 9.9% equity to be vested to Adam once we are granted license."[3]

---

[1] 7/13/2020 Whatsapp conversation between Zampella and Sherman.
[2] 7/19/2018 email from Zampella to Marin King at 2:29 PM.
[3] 7/20/2018 email from Zampella to Pia Naib at 2:51 PM.

4

22. As a co-owner of Cottonwood, Sherman's role was to help operate and successfully grow the company. Sherman was responsible for managing many aspects of the business, including automating Quickbooks accounting, hiring specialists to assist with certain projects and formulating a general roadmap for Cottonwood's development. Later, Sherman took on other foundational roles in Cottonwood, such as growth strategy, hiring key employees (including Cottonwood's general counsel), contract negotiations and reviewing potential partnerships. Sherman also held the critical position of CISO—a role mandated for digital currency companies under New York state law. Sherman achieved this in part because Zampella was deemed to be ill-suited for the position.[4]

23. Sherman also did the major work in successfully securing the aforementioned BitLicense from New York State, which was required in order for Cottonwood to operate as a digital currency business. Obtaining the BitLicense was a rigorous bureaucratic process, which involved cybersecurity audits, interfacing with regulators and designing and implementing Cottonwood's own cybersecurity policy and documents.

## II. SHERMAN WAS THE CHIEF ARCHITECT OF COTTONWOOD'S KIOSK/ATM SOFTWARE—AN INNOVATION THAT WAS CRITICAL TO COTTONWOOD'S SUCCESS

24. Cottonwood purchased its physical Bitcoin kiosks/ATMs from Genmega Inc., an ATM hardware provider. The kiosks/ATMs were equipped with Genesis Bitcoin ATM ("Genesis") proprietary software that formed the "brains" of the machine. In order to use the Genesis software that operated the kiosks/ATMs, Genesis charged Cottonwood a transaction fee amounting to 1% of the notional value of each transaction. For example, if a customer purchased $40,000.00 of Bitcoin, Genesis charged Cottonwood a transaction fee of $400.00.

---

[4] 6/25/2018 email from Zampella to Pierre Basmaji and Sherman at 5:58 PM.

25. This 1% Genesis transaction fee weighed heavily on the profitability of Cottonwood. Consequently, Zampella wanted Cottonwood to develop its own software so that it did not have to pay the 1% transaction fee to Genesis and could capture all the fees for itself.

26. Zampella did not have the programming skills to develop the necessary software, so he caused Cottonwood to hire software developers to write the code. However, the software developers hired by Cottonwood were unsuccessful and Zampella fired them. Approximately three months after he was hired, and following Zampella's termination of the software developers, Sherman volunteered to develop proprietary software for use in the Cottonwood kiosks/ATMs (the "Software") to replace the Genesis software.

27. From early 2018 onward, Sherman spent a majority of his time designing and developing the Software on the Cottonwood git repository and inserting legacy scripts into the new design/system.

28. Sherman created the entire systems typology (including network design), requiring the formulation of cloud servers, security design, data models and a database. He also decided what technologies to use and how to use them.

29. After this initial work, Sherman proceeded to write all of the substantive portions of the Software's source code. Simultaneously, he also taught Zampella the coding skills necessary for Zampella to code the Software. Zampella's inexperience with computer languages and reliance on Sherman is evident throughout their Whatsapp and email correspondence, where Zampella asks Sherman repeatedly for help.[5]

---

[5] 10/1/2019 email from Sherman to Zampella at 5:57 PM; 6/6/2019, 6/17/2019 and 7/4-7/5/2019 Whatsapp conversations.

30. Zampella contributed the non-substantive, repetitive portion of the Software's code, which closely follows the essential architecture created by Sherman. Without Sherman's architecture and instructions, Zampella would not have been able to write any significant portion of the Software's code.

31. The Software's code was kept in a password-protected cloud git repository labeled "Cottonwood" made available through the Bitbucket service system. Both Sherman and Zampella had access to this git repository.

32. Upon completion of a beta version of the Software, Sherman was responsible for testing, modifying, implementing and continuously improving the Software, something he continuously worked on while employed at Cottonwood.

33. The Software was successfully implemented by Cottonwood and is currently used to run all of Cottonwood's kiosks/ATMs. It is superior to the Genesis software and includes a multitude of additional features that were not provided by the Genesis software.

34. The Software is extremely valuable and without it, the value of Cottonwood is extremely diminished since Cottonwood would have to pay license fees in the form of a 1% transaction fee to Genesis.

III. **ZAMPELLA USES COINDADO TO LOOT COTTONWOOD'S ASSETS**

35. Coindado is a shell company 100% owned and controlled by Zampella. It has no employees and its sole business purpose is to illegally capture all of Cottonwood's profits and divert those profits to Zampella's personal coffers.

36. Zampella orchestrated his illegal scheme to use Coindado to loot Cottonwood as follows:

37. First, without telling Sherman, Zampella caused Cottonwood to sign a license agreement falsely stating that the Software belongs to Coindado and that Coindado was licensing

the Software to *Cottonwood*. Of course, this was completely untrue as the Software belongs to Cottonwood.[6] However, Zampella simply signed the license agreement on behalf of both Cottonwood and Coindado without discussing or disclosing it to Sherman. Sherman had no knowledge of this license agreement between Cottonwood and Coindado until December 30, 2020.

38. Second, the license agreement charges Cottonwood a transaction fee of 5% of the notional value of each transaction. That is *five times* higher than the fee Cottonwood was paying Genesis. This outrageous fee is the product of Zampella's illegal self-dealing. Zampella and Cottonwood now use this unlawful maneuver to drain Cottonwood of a majority of, if not all, of its profits.

39. Third, on May 24, 2020, Zampella completed the final step in his illegal scheme to convert the Software for his own personal benefit and drain Cottonwood of its most valuable asset as well as its profits. Zampella unilaterally transferred the Software from the Cottonwood git repository to a new git repository he created and labeled "Coindado." Zampella made the transfer by seizing every file related to the Software code in the Cottonwood git repository and migrating the files over to the newly created git repository labeled "Coindado." Zampella also changed the header on all the Python files to have the author listed as 'coindado' instead of 'adam' or 'aniello' or 'adam & aniello.'

40. By doing so, Zampella misappropriated Cottonwood's proprietary Software—its single most valuable asset—to Coindado. Cottonwood received no consideration for the transfer of the Software to Coindado.

---

[6] The fact that the Software belongs to Cottonwood is beyond any colorable dispute. The entire time that Sherman worked on developing and writing the Software, he was employed by Cottonwood. Sherman has never been an employee or member of Coindado, nor has Sherman ever been compensated by Coindado. The Software was also kept in a git repository entitled "Cottonwood" and every page of the code contained a header with a reference denoting the author of that portion of the code – either "adam," "aniello" or "adam & aniello." Finally, Coindado never paid Cottonwood any consideration for the Software.

41. In the second half of 2020, Cottonwood began using new ATMs, for which Cottonwood paid a 5% transaction fee to Coindado. Coindado—solely owned by Zampella—currently receives all of the transaction fees paid to Cottonwood.

42. The revenue generated by the Cottonwood ATMs using the Software is massive. In 2019, Cottonwood paid Coindado approximately 66.52 BTC in licensing fees. In 2020, Cottonwood paid Coindado 159.3089 BTC in licensing fees. And in 2021, Cottonwood paid Coindado 42.52 BTC through September 20, in licensing fees. Overall, Coindado received approximately 268.35 BTC in licensing fees through September 20, 2021.

43. Due to the fluctuating price of cryptocurrency, the combined Bitcoin amount in its market value as of September 20, 2021 (approximately $43,585.22 per BTC) is worth approximately $11,696,093.80. All of this money rightfully belongs to Cottonwood—not Coindado or Zampella.

## IV. ZAMPELLA CONVERTED ASSETS FROM COTTONWOOD WHEN HE CONVERTED 180 BTC

44. In addition to stealing Cottonwood's valuable Software, Zampella committed another act of conversion by taking 180 BTC from the Cottonwood wallet and transferring it to himself.

45. On December 14, 2018, Zampella took 180 BTC from Cottonwood, which as of September 20, 2021, is worth approximately $7,845,339.60.

46. Cottonwood's 2018 audited financial statements falsely state that the 180 BTC belonged to Zampella—not Cottonwood.

47. The financial statements are patently false since the 180 BTC was held by Cottonwood in its wallet/account. Zampella and Cottonwood were required by law to maintain

separate Bitcoin wallets, to avoid the commingling of business and personal assets. But Zampella withdrew the 180 BTC from Cottonwood's wallet—not his own.

48.     The 180 BTC converted by Zampella not only belonged to Cottonwood—but was used by Cottonwood to manage inventory on a daily basis and operate its business.

## V.    ZAMPELLA REFUSES TO ACKNOWLEDGE SHERMAN'S MEMBERSHIP INTEREST IN COTTONWOOD

49.     After finally learning about the existence of Coindado, on December 7, 2020, Sherman confronted Zampella about the true purpose of Coindado.

50.     After confronting Zampella, on December 30, 2020, Sherman learned of the secret, illegal licensing agreement between Coindado and Cottonwood.

51.     Sherman then confronted Zampella about how Zampella's improper actions—including, but not limited to, the misappropriation of Cottonwood's valuable proprietary Software—damaged Cottonwood.

52.      In response, Zampella denied that Sherman's MI ever vested, claiming that it would vest only upon a sale of the company. Sherman advised Zampella that was not the deal they had struck.

53.     Indeed, Zampella's own emails state that the 9.9% vested when the Bitlicense was issued, and that license was issued in 2019.

54.     In order for Sherman to be made whole and to redress Zampella's breaches of contract and fiduciary duty, misappropriation and conversion, he must be compensated for the value of his 9.9% MI in Cottonwood.

## CAUSES OF ACTION

I. **COUNT I—BREACH OF CONTRACT, INDIVIDUALLY, AGAINST COTTONWOOD**

55. Sherman repeats, realleges, and incorporates by reference the foregoing paragraphs, as though fully stated herein.

56. When Sherman was hired, Zampella, in his capacity as manager and sole member of Cottonwood, agreed that upon Sherman's commencement of work at Cottonwood, Sherman would immediately become a member of Cottonwood with a 9% membership interest that entitled Sherman, to amongst other things, a 9% share of the profits of Cottonwood.

57. Sherman began work at Cottonwood on or about November 17, 2017 and became a 9% member.

58. To the extent that Sherman somehow was not granted a 9% membership interest in Cottonwood on November 17, 2017, Sherman was certainly granted a 9.9% membership interest on or about July 20, 2018 when Zampella advised Sherman and Cottonwood's lawyers at Latham & Watkins, in writing, that upon the issuance of the New York State BitLicense, Sherman would become a 9.9% member of Cottonwood.

59. New York State granted the BitLicense on January 31, 2019. Therefore, Sherman is currently a 9.9% member of Cottonwood.

60. Zampella, in his capacity as manager and majority member of Cottonwood, has refused to acknowledge Sherman's 9.9% membership interest in Cottonwood. Zampella has not amended the Cottonwood operating agreement to include Sherman, has not provided Sherman with a K-1 from Cottonwood, and has not distributed any of the Cottonwood profits to Sherman.

61. Sherman began work on or about November 17, 2017, thereby fulfilling all of his obligations under the oral agreement. In addition, with respect to the grant of the 9.9% MI

referenced above, the New York State BitLicense was issued on January 31, 2019, thereby creating full performance under the second agreement.

62. Cottonwood has breached its obligations under both of the aforementioned contracts.

63. As a result of these breaches, Sherman has been damaged in an amount to be determined at trial, but not less than $7 million.

## II. COUNT II—INDIVIDUAL CLAIM AGAINST COTTONWOOD FOR DECLARATORY JUDGMENT THAT SHERMAN IS A 9.9% OWNER OF COTTONWOOD

64. Sherman repeats, realleges, and incorporates by reference the foregoing paragraphs, as though fully stated herein.

65. There is an actual controversy between the parties with respect to their present rights and legal relations regarding the ownership of Cottonwood.

66. In addition to his annual salary upon his hiring, Sherman was granted a 9% interest in Cottonwood, which was later increased to 9.9%.

67. Zampella denies Sherman holds a 9.9% MI in Cottonwood despite their contractual agreement.

68. Accordingly, Sherman is entitled to a declaratory judgment declaring that he owns 9.9% of Cottonwood.

## III. COUNT III — CONVERSION OF SOFTWARE AND ASSOCIATED ASSETS, DERIVATIVELY ON BEHALF OF COTTONWOOD, AGAINST COINDADO

69. Sherman repeats, realleges, and incorporates by reference the foregoing paragraphs, as though fully stated herein.

70. The Software is owned by Cottonwood.

71. Defendant Coindado exercised and continues to exercise unauthorized dominion over Cottonwood's Software by taking possession and control of the Software from Cottonwood for no consideration.

72. Zampella then caused Cottonwood to enter into an egregious, non-commercial and unfair licensing agreement with Coindado, which obligates Cottonwood to pay exorbitant licensing fees to Coindado for the use of its own Software. Coindado deprived Cottonwood of its rightful assets (Software and profits), through this illegal agreement.

73. Coindado's unauthorized dominion over the Software in derogation of Cottonwood's rights to its Software and associated assets constitutes conversion under New York state law.

74. As a result of this conversion, Cottonwood has been damaged in an amount to be determined at trial, but not less than $60 million.

### IV. COUNT IV—CONVERSION OF BTC DERIVATIVELY ON BEHALF OF COTTONWOOD, AGAINST ZAMPELLA

75. Sherman repeats, realleges, and incorporates by reference the foregoing paragraphs, as though fully stated herein.

76. The BTC in Cottonwood's wallet/account belong to Cottonwood.

77. Zampella took 180 BTC from Cottonwood's wallet/account, and transferred it to his personal digital wallet for his private use.

78. Zampella's exercise of an unauthorized dominion over Cottonwood's BTC in derogation of Cottonwood's rights to its BTC constitutes conversion under New York state law.

79. As a result of this conversion, Cottonwood has been harmed in an amount to be determined at trial, but not less than $8 million dollars.

**V.     COUNT V — MISAPPROPRIATION OF TRADE SECRETS, DERIVATIVELY ON BEHALF OF COTTONWOOD, AGAINST COINDADO**

80.     Sherman repeats, realleges, and incorporates by reference the foregoing paragraphs, as though fully stated herein.

81.     The Software is a trade secret as (i) the Software is not well known outside of the business; (ii) the Software is known by Zampella and Sherman and a few employees who are granted permission; (iii) great measures have been taken to guard the Software's secrecy; (iv) the Software is valuable to the business and its competitors; (v) a great deal of effort was spent in developing the software; and (vi) it is very difficult the obtain the Software or duplicate it.

82.     The Software is not known outside Cottonwood at all.  It is unique information that is only available to people inside Cottonwood.

83.     Zampella and Sherman were the only two authors of the Software.  Only Zampella and Sherman, and certain employees of Cottonwood to whom they permitted access, know of the Software.

84.     Zampella and Sherman went to considerable lengths to protect the Software and keep it highly confidential.  The Software was maintained in a password protected git repository.  Only Zampella or Sherman had access to the git repository.  Any other persons contracted to do work for Cottonwood would need their special permission to access this protected information.

85.     The Software is very valuable and lucrative, as it enables Cottonwood to operate its kiosks/ATMs without having to pay licensing fees to third parties.  The value of the Software as of 2021 is at least $60 million.

86.     The Software took many working hours over a period of months to develop and over a year to perfect and test from 2018 through 2019.

87. Because of the intense secrecy and security surrounding the Software, it is extremely difficult for others to acquire or duplicate the Software.

88. The Software was a trade secret that belonged to Cottonwood.

89. Zampella's transfer of the Software from Cottonwood to Coindado for no consideration constitutes a misappropriation of Cottonwood's trade secret under New York law.

90. As a result of Coindado's misappropriation of Cottonwood's trade secret, Cottonwood has been damaged in the amount to be determined at trial but not less than $60 million.

## VI. COUNT VI — BREACH OF FIDUCIARY DUTY, INDIVIDUALLY ON BEHALF OF SHERMAN, AGAINST ZAMPELLA

91. Sherman repeats, realleges, and incorporates by reference the foregoing paragraphs, as though fully stated herein.

92. Zampella, the majority member and managing member of Cottonwood owes a fiduciary duty to Sherman, a non-managing member.

93. As the managing member of Cottonwood, Zampella owed Sherman fiduciary duties of candor, good faith and undivided loyalty, including a duty not to waste or divert corporate assets for his benefit or the benefit of entities in which Zampella has an interest.

94. Zampella breached his fiduciary duties to Sherman by misappropriating Cottonwood's assets, including, but not limited to, (i) the Software, and diverting it to Coindado, an entity in which Zampella—but not Sherman—had an interest and which competed directly with Cottonwood; (ii) 180 BTC that Zampella transferred from Cottonwood's BTC wallet to his personal wallet; and (iii) millions of dollars of licensing fees paid by Cottonwood to Coindado pursuant to the improper licensing agreement, which all accrued to Zampella's personal benefit.

95. None of the aforementioned related party transactions were fair or reasonable to Sherman.

96. As a result of Zampella's breaches of fiduciary duties to Sherman, Sherman has suffered damages and Zampella is liable to him in an amount to be determined at trial but not less than $5 million.

### VII. COUNT VII — UNJUST ENRICHMENT, DERIVATIVELY ON BEHALF OF COTTONWOOD, AGAINST ZAMPELLA AND COTTONWOOD

97. Sherman repeats, realleges, and incorporates by reference the foregoing paragraphs, as though fully stated herein.

98. The Defendants received a benefit and enriched themselves by taking (i) the Software, (ii) the profits and (iii) the 180 BTC from Cottonwood, at the expense of, and to the detriment of Cottonwood.

99. There is no valid contract that entitled them to take these assets and provide themselves the benefit of these assets.

100. Consequently, the Defendants have been unjustly enriched at the expense of Cottonwood, and, in good conscience and equity, are liable for the entire value of the Cottonwood business.

101. As a result of the Defendants' unjust enrichment, Cottonwood was harmed in an amount to be determined at trial but not less than $60 million.

### VIII. COUNT VIII — UNJUST ENRICHMENT, INDIVIDUALLY ON BEHALF OF SHERMAN, AGAINST COTTONWOOD AND ZAMPELLA

102. Sherman repeats, realleges, and incorporates by reference the foregoing paragraphs, as though fully stated herein.

103. If the Court finds there was no contractual agreement making Sherman a member of Cottonwood, then Cottonwood, and Zampella have all been unjustly enriched by the services Sherman provided, which were worth far in excess of a $125,000 annual salary.

104. Sherman provided his fintech expertise and labor based on his agreement with Zampella that he owned at least 9% of Cottonwood. Sherman provided crucial services for Cottonwood—including, but not limited to, the creation of the Software—which enriched Cottonwood and Zampella.

105. If Sherman is found not to be at least a 9.9% member of Cottonwood, then Zampella and Cottonwood unjustly benefited and continue to benefit financially from the services provided by Sherman.

### IX. COUNT IX—INDIVIDUAL CLAIM FOR COMMON LAW DISSOLUTION OF COTTONWOOD

106. Sherman repeats, realleges, and incorporates by reference the foregoing paragraphs, as though fully stated herein.

107. Sherman is a member of Cottonwood.

108. Common law (equitable) dissolution is warranted because of Defendants' egregious malfeasance, including engaging in the above-detailed looting of Cottonwood assets and self-dealing.

109. As a result of the above-detailed egregious misconduct, common law dissolution of Cottonwood is necessary.

110. Consequently, this Court should enter an order dissolving Cottonwood and appointing a receiver to wind up its affairs, or in the alternative, ordering Zampella to purchase Sherman's 9.9% MI for fair value.

### X. COUNT X —INDIVIDUAL CLAIM FOR STATUTORY DISSOLUTION OF COTTONWOOD

111. Sherman repeats, realleges, and incorporates by reference the foregoing paragraphs, as though fully stated herein.

112. Sherman is a member of Cottonwood.

113. It is not reasonably practicable to carry on Cottonwood's business in conformity with its respective articles of organization or operating agreement because the managing member continues to loot Cottonwood and ignore its business purpose in order to enrich Coindado and himself.

114. Indeed, Zampella, as managing member and majority member of Cottonwood, is unwilling to reasonably permit or promote the stated purpose of Cottonwood to be realized or achieved.

115. This Court should order the judicial dissolution of Cottonwood pursuant to LLCL § 702, or alternatively, order Zampella and/or Cottonwood to purchase Sherman's 9.9% MI for fair value.

116. If the Court orders dissolution, the Court should order the winding up of the affairs of Cottonwood incident to dissolution pursuant to LLCL § 703.

### XI. COUNT XI—INDIVIDUAL CLAIM FOR EQUITABLE BUYOUT OF 9.9% MI

117. Sherman repeats, realleges, and incorporates by reference the foregoing paragraphs, as though fully stated herein.

118. In lieu of winding up of the affairs of Cottonwood, the sale of Cottonwood's assets, and termination of Cottonwood's juridical existence, this Court should order the compulsory buyout of Sherman's MI in Cottonwood for fair value as just and equitable under the circumstances.

### XII. COUNT XII—AN ACCOUNTING AGAINST ZAMPELLA

119. Plaintiff repeats, realleges, and incorporates by reference the foregoing paragraphs as though fully stated herein.

120. As the managing member of Cottonwood, Zampella owed fiduciary duties of candor, good faith and undivided loyalty to Sherman.

121. Zampella breached his fiduciary duties to Sherman by, *inter alia* (i) misappropriating Cottonwood's assets, including the Software, and diverting them to Coindado, a company solely owned by Zampella; (ii) causing Cottonwood to enter into an egregious, non-commercial and unfair licensing agreement with Coindado for use of the Software; and (iii) converting Cottonwood's BTC for his personal use.

122. The amount of money and profits looted from Cottonwood as a result of Zampella's actions is unknown and cannot be ascertained except through an accounting by Zampella of all money that he withdrew or transferred from Cottonwood to himself, Coindado or any other entity that he had an interest in.

123. Sherman accordingly requests the Court for an accounting to Zampella to ascertain the amounts due to Plaintiff.

## PRAYER FOR RELIEF

**WHEREFORE** Sherman respectfully demands, a declaratory judgment, dissolution of Cottonwood, damages of at least $60 million plus interest and attorney fees, and any other relief the Court deems just and proper.

Dated: New York, NY
May 26, 2022

SADIS & GOLDBERG LLP

/s/ Douglas R. Hirsch
By: Douglas R. Hirsch
Jennifer Rossan
Michael A. Davis

551 Fifth Avenue, 21st Floor
New York, New York 10176
Telephone: (212) 947-3793
Email: dhirsch@sadis.com
jrossan@sadis.com
mdavis@sadis.com

*Attorneys for Adam Sherman*